UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                          :

In re GLOBAL CROSSING, LTD.         :         02 Civ. 910 (GEL)
SECURITIES LITIGATION            :

                                            :       **OPINION AND ORDER**
------------------------------------------------------------x

Grant & Eisenhofer, P.A., Wilmington, DE (Jay W.
Eisenhofer, Sidney S. Liebesman, Michael J. Barry,
Michelle T. Wirtner, Sharan Nirmul), for Lead
Plaintiffs Public Employees Retirement System of
Ohio and State Teachers Retirement System of Ohio.

Mayer, Brown, Rowe & Maw LLP, New York, NY
& Chicago, IL (Robert J. Ward, Beth Ann Schultz,
Alan N. Salpeter, Michele Odorizzi, T. Mark
McLaughlin), for Defendants Canadian Imperial
Bank of Commerce ("CIBC") and CIBC World
Markets Corp., and for CIBC Capital Partners and
CIBC Capital Partners (Cayman).

GERARD E. LYNCH, District Judge:

      This consolidated class action arises from alleged accounting improprieties at Global

Crossing, Ltd. ("GC") and its affiliated entity Asia Global Crossing Ltd. ("AGC"). The Second

Amended Consolidated Class Action Complaint ("Complaint") includes seven counts against

Canadian Imperial Bank of Commerce ("CIBC") and CIBC World Markets Corp. ("World

Markets") based on these entities' alleged participation in fraud at GC and ACG: Count I asserts

a claim against CIBC under Section 10(b) of the Securities Exchange Act ("Exchange Act") and

SEC Rule 10b-5, see 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5; Count II asserts a claim against

CIBC under Section 20(a) of the Exchange Act, see 15 U.S.C. § 78t(a); Count XIII asserts a

claim against CIBC and World Markets under Section 15 of the Securities Act of 1933

("Securities Act"), see id. § 77o; Count XVI asserts a claim against CIBC under Section 12(a)(2)

of the Securities Act, see id. § 77l(2); and Count XXVII asserts respondeat superior claims

against CIBC and World Markets under Section 10(b), Rule 10b-5, Section 11 of the Securities Act, see id. § 77k, and Section 12(a)(2). Counts XVIII and XIX assert claims against World Markets relating to its role as an underwriter in ACG's October 2000 initial public offering ("IPO").[1]

Plaintiffs move for default judgment as to World Markets and two other CIBC affiliates, CIBC Capital Partners ("Capital Partners") and CIBC Capital Partners (Cayman) ("Cayman"), while defendants move to dismiss all claims against them. For the following reasons, plaintiffs' motion for default judgment is denied; defendants' motion to dismiss is granted in part and denied in part.

## BACKGROUND

The allegations of fraud at GC and AGC are described in detail in the Court's prior opinions, and therefore need not be repeated here. See, e.g., In re Global Crossing, Ltd. Secs. Litig., 322 F. Supp. 2d 319 (S.D.N.Y. 2004); In re Global Crossing, Ltd. Secs. Litig., 313 F. Supp. 2d 189 (S.D.N.Y. 2003). Facts particular to the claims against the present defendants are set forth below, and are taken from allegations in the complaint; those allegations are accepted as true for the purpose of this motion, and all reasonable inferences are drawn in plaintiffs' favor. See Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995).

CIBC is a financial institution based in Toronto, Canada, that through a variety of subsidiaries, affiliates and divisions – including World Markets, Capital Partners, and Cayman – invested in GC and provided it with commercial and investment banking services, underwriting

_____

[1] The Court will address the merits of claims relating to World Markets's involvement with the AGC IPO in deciding a separate motion to dismiss filed by the AGC IPO underwriters.

services, and advisory services.  (Compl. ¶ 104.)  In 1997, CIBC[2] invested $41 million in GC in exchange for a 25% stake in the company and the opportunity to designate five members of the GC Board of Directors.  (Id. ¶¶ 105, 107.)[3]  The CIBC designees, Jay R. Bloom, Dean C. Kehler, Jay R. Levin, William D. Phoenix, and Bruce Raben – all managing directors of World Markets – served on the GC Board for various periods between March 1997 and June 2000.  (Id. ¶¶ 47-51, 105, 107.)  CIBC also received a shareholder agreement that gave it "the right to participate in any transaction initiated by [Pacific Capital Group ("PCG")] or other large stockholders that would transfer more than 5% of Global Crossing's outstanding securities or result in a change of control of the Company."  (Id. ¶ 213.)

Plaintiffs claim that CIBC and various of its subsidiaries and affiliates, through their own actions and those of the CIBC designees, had a hand in the fraud that caused GC's collapse and hit shareholders to the tune of roughly $47 billion.  (Id. ¶ 442.)  First, plaintiffs note that CIBC was able to turn a handsome profit on its GC investment, making at least $1.7 billion through a series of transactions during the period at issue.  (Id. ¶ 105.)  Plaintiffs claim that by March 1999 (after a 2-for-1 stock split), CIBC was the largest GC shareholder and "had the power [to] and did in fact materially impact Global Crossing's transactions."  (Id. ¶ 212, 217-18.)  Thereafter, CIBC began diminishing its GC holdings:  For instance, in June 1999, CIBC and World Markets

---

[2]  It is often unclear from the Complaint which allegations apply to which CIBC entities, an issue discussed further below.  See infra Discussion, Part I.  For the purpose of this background summary, the Court assumes that "CIBC" refers to CIBC itself, that "CIBC Defendants" refers to CIBC and World Markets, and that other CIBC entities are referred to specifically by name.

[3]  According to GC's 10-Ks, the Board had a total of seventeen members in 1998 and twenty members in 1999.  (Mot. Dismiss Ex. A at 35, Ex. C at 43.)

sold 8.8 million GC shares in response to a tender offer that was made to all GC shareholders, netting $553 million, (id. ¶ 105), and in or about April 2000, CIBC sold 6.7 million shares ("beneficially owned" by CIBC but "belonging" to Cayman (id. ¶ 506)) as a part of GC's secondary stock offering, reaping $221.1 million. (Id. ¶¶ 108, 219, 842.) As CIBC's GC holdings decreased, its representation on the Board did as well – in September 1999, two CIBC designees resigned from the GC Board, and the remaining designees followed suit in June 2000. (Id. ¶¶ 47-51.) Plaintiffs claim that the June 2000 resignations were engineered by CIBC so that it could dump its remaining GC shares without publically reporting the sales, and that CIBC indeed sold its remaining GC stock after the resignation of its designees, "reportedly receiving over $1 billion." (Id. ¶ 194-95.)[4] GC filed for bankruptcy in January 2002, after all of the CIBC designees had left the GC Board. (Id. ¶ 26.) Plaintiffs also claim that CIBC provided financial services to GC during the period at issue, pocketing large fees in the process. For instance, CIBC earned $135 million in advisory fees for its involvement with twelve deals, (id. ¶ 144, 145) and earned additional fees as a syndicator on GC's $1 billion revolving credit facility (id. ¶ 106). In addition, CIBC, through various CIBC entities, served as an underwriter for various GC and ACG stock offerings. (Id. ¶¶ 104, 106, 217, 220, 834.)

All the while, plaintiffs claim, CIBC was aware, through, inter alia, the participation of its designees on GC Board (id. ¶ 833) that GC was artificially inflating its reported revenue through improper IRU swap transactions, that the company's public financial statements were

_____

[4] It is not clear whether plaintiffs claim that CIBC sold the remainder of its GC shares, or merely that they presume that it did. See Compl. ¶ 844 ("assuming" that "CIBC followed through with its stated intent to divest its investments in Global Crossing" "after its designees resigned from the Board in 2000").

false and misleading (certain of which were signed by CIBC's designees (id. ¶ 47-51)), and that

GC's business model was "moribund." (Id. ¶ 221, 833, 845, 1109.) Moreover, CIBC had the

power to cause or prevent these fraudulent actions by virtue of its control over GC. (Id. ¶¶ 1112-

13.)

**DISCUSSION**

I.    Motion for Default Judgment, Statute of Limitations, and Proper Identification of
      Defendants

Defendants argue that any potential claims against World Markets, Capital Partners, and

Cayman should be dismissed because plaintiffs have at no time identified Capital Partners and

Cayman as defendants, and did not name World Markets as a defendant until the second

amended complaint was filed in March 2004, more than one year after the filing of plaintiffs'

original complaint, and long after the relevant statutes of limitations had run. Plaintiffs have

responded by moving for default judgment against World Markets, Capital Partners, and

Cayman. Plaintiffs claim that either World Markets, Capital Partners, and Cayman must

concede that they are and always have been defendants in this action because they responded to

the original, amended and second amended complaints via prior submissions filed by CIBC, or

these entities failed to respond to those pleadings and default judgment is appropriate. (Pl.'s

Mem. Reply Mot. Default J. at 1-2.)

Plaintiffs' motion will be denied. That CIBC responded to prior versions of the

complaint on behalf of World Markets, Capital Partners, and Cayman is not, by itself, a

concession that those entities are defendants in this action. In fact, CIBC points out that a prior

motion to dismiss "argued that plaintiffs were required to amend their complaint if they wanted

to sue the CIBC Affiliates" (Def.'s Mem. Opp. Mot. Default J. at 13), a point that plaintiffs

essentially concede: "In the last round of briefing . . . CIBC complained that it could not determine which entity was sued on particular counts of the complaint due to the plaintiffs' use of the term 'CIBC' to refer to all of the CIBC-related entities collectively."  (Pl.'s Mem. Opp. Mot. Dismiss at 17-18.)  By the same token, assuming that World Markets, Capital Partners, and Cayman have been properly identified as defendants, CIBC's contrary argument is not a concession that it was *not* responding on behalf of those entities, such that those entities failed to timely respond in this action.

At the same time, the Court rejects defendants' argument that the statutes of limitations have run on the claims against World Markets, even assuming that World Markets was first named as a defendant in the current complaint.  Fed. R. Civ. P. 15(c) provides that "[a]n amendment of a pleading relates back to the date of the original pleading" under various circumstances, two of which are relevant here.  As to Counts XIII and XXVII, in which CIBC World Markets was *added* as a defendant, Rule 15(c)(2) states that "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading," a condition that is clearly satisfied in this case.  As to Counts XVIII and XIX, relating to the AGC IPO, in which World Markets was *substituted for* CIBC as a defendant, the Court is satisfied that the conditions of Rule 15(c)(3) – which applies where "the amendment changes the party or the naming of the party against whom a claim is asserted" – have been met.  The only condition at issue is whether plaintiffs "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against" World Markets.  Id.  While defendants ascribe a tactical motivation

to plaintiffs' attempt to sue CIBC and not World Markets on these claims (Def.'s Mem. Opp. Mot. Dismiss at 38-39), the Court is not convinced.

However, the Court agrees that Capital Partners and Cayman have not been properly identified as defendants in this action. After plaintiffs filed the first amended complaint, they were given the opportunity to amend their complaint to indicate which of their claims were directed at which CIBC entities; plaintiffs did so, adding or substituting World Markets as a defendant on four separate counts of the complaint. Plaintiffs did not, at that time (or any time thereafter), identify Capital Partners and Cayman as defendants as to any count. And while plaintiffs' motion for default judgment refers to CIBC, World Markets, Capital Partners, and Cayman collectively as "the CIBC defendants" (Pl.'s Rep. Mot. Default J. at 1), the Complaint names as "CIBC Defendants" only CIBC and World Markets (Compl. ¶ 104), specifically referring to Capital Partners and Cayman as "affiliates of the CIBC Defendants," not defendants in their own right (id. ¶ 108). True, the Complaint in one paragraph lumps together "a variety of subsidiaries, affiliates and division[s]" including Capital Partners and Cayman as, "collectively . . . CIBC" (id. ¶ 104), and then, a thousand paragraphs later, names "CIBC" as a defendant on various counts. But the Complaint clearly uses the collective "CIBC" reference in order to attribute the conduct of the various CIBC entities to CIBC, not as a shorthand to charge each and every CIBC "subsidiar[y], affiliate[] and division" with separate liability wherever CIBC is a named defendant. Finally, plaintiffs did serve copies of the original, amended, and second amended complaints on Capital Partners and Cayman. However, while service may be sufficient to provide notice of the existence of an action, it is insufficient, without more, to establish the recipient as a defendant.

For these reasons, Capital Partners and Cayman have not adequately been identified as defendants in the Complaint. Because plaintiffs have been given (and have taken) the opportunity to clarify which CIBC entities are defendants as to which claims, justice does not require that the Court grant leave for plaintiffs to correct this defect, and none shall be granted. See Fed. R. Civ. P. 15(a) (noting that leave to amend complaint shall be freely given "when justice so requires").

II. Rule 12(b)(6) Motion to Dismiss

When deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court accepts as true all facts alleged in the complaint, and draws all inferences in favor of the plaintiff. See Twombly v. Bell Atl. Corp., ___ F.3d ___, 2005 WL 2420523, at *6 (2d Cir. Oct. 3, 2005). "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. (internal quotation marks omitted).

A. Respondeat Superior (Count XXVII)

Advancing a respondeat superior theory, plaintiffs allege that CIBC and World Markets violated Section 10(b) and Rule 10b-5(b) through the actions of the CIBC designees, who among other things allegedly signed several false and misleading financial statements during their tenure on GC's board (Count XXVII). (Pl.'s Mem. Opp. Mot. Dismiss at 21-27.)

Under Section 10(b) and Rule 10b-5(b), a plaintiff must allege that the defendant, "in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000). Neither

Section 10(b) nor Rule 10b-5 reaches past "primary violators," i.e., "those who commit a manipulative or deceptive act in connection with the purchase or sale of securities – and not individuals who aid and abet in the violation." Rich v. Maidstone Fin., Inc., No. 98 Civ. 5862, 2002 WL 31867724, at *7 (S.D.N.Y. Dec. 20, 2002), quoting Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 166, 191 (1994). Thus, in Wright v. Ernst & Young LLP, the Second Circuit noted that "if Central Bank is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)." 152 F.3d 169, 175 (2d Cir. 1998) (internal quotation marks and alterations omitted). At first blush, this would seem to foreclose any argument that CIBC and World Markets may be liable under Section 10(b) and Rule 10b-5(b) for statements made by the CIBC designees.

Plaintiffs argue, however, that CIBC and World Markets may be held liable as primary violators pursuant to the common-law doctrine of respondeat superior, by which an employer may be held liable for the tortious acts of an employee committed within the scope of his employment. See Marbury Mgm't, Inc. v. Kohn, 629 F.2d 705, 716 (2d Cir. 1980) (noting that employer liability depends on whether employee can "fairly be considered" to be acting "within the scope of his employment"); In re Blech Secs. Litig., No. 94 Civ. 7696, 2002 WL 31356498, at *22 (S.D.N.Y. Oct. 17, 2002) (same); see also Restatement (Second) of Agency § 219(1) (1958) (stating "[a] master is subject to liability for the torts of his servants committed while acting in the scope of their employment"). The Second Circuit has indicated that respondeat superior applies in the federal securities context, see Marbury, 629 F.2d at 717, a view that has

9

been embraced by virtually every circuit to address the question, see Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1576 n.27 (9th Cir. 1990) (in banc) (noting that every circuit to address the question, except the Fourth Circuit, whose "law is in a state of confusion," has accepted some version of respondeat superior liability in the federal securities context).[5]

Nevertheless, plaintiffs' allegations are insufficient. They contend that CIBC and World Markets should be liable for false and misleading statements signed by the CIBC designees because the designees were high-level World Markets employees chosen by CIBC to sit on GC's Board of Directors. The Court has previously rejected an identical claim, on highly similar factual allegations, in this very case. See In re Global Crossing Ltd. Secs. Litig., No. 02 Civ. 910, 2005 WL 1881514, at *3-*4, *9-*10 (S.D.N.Y. Aug. 5, 2005) (holding that defendants Microsoft and Softbank could not be held liable for actions of designees on ACG's Board; emphasizing that directors "had fiduciary duties to act on behalf of the shareholders of ACG itself, not on behalf of the entities that appointed them," and that "the mere fact that they held high positions with Microsoft and Softbank, and were appointed to the ACG board by those corporations, cannot, standing alone, establish that they acted as agents . . . of Microsoft and Softbank").

Moreover, plaintiffs point to no case where a corporation has been held liable on a theory of respondeat superior for the actions of its employees in their capacities as independent directors sitting on the board of a different corporation. Indeed, this is a far cry from the typical

_____

[5] After the Supreme Court's decision in Central Bank, at least one court in this district held that respondeat superior liability was no longer available under Section 10(b) and Rule 10b-5. See ESI Montgomery County, Inc. v. Montenay Int'l Corp., No. 94 Civ. 0119, 1996 WL 22979, at *3 (S.D.N.Y. Jan. 23, 1996). The Second Circuit has since indicated otherwise. See Suez Equity Investors v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001).

case in which respondeat superior liability has been accepted in the federal securities context –

where, for instance, a brokerage firm is deemed liable for the misdeeds of its brokers.  See, e.g.,

Marbury, 629 F.2d at 716 (brokerage firm liable where "the erring salesman completes the

transactions though the employing brokerage house and the brokerage house receives a

commission on the transactions"); SEC v. Mgm't Dynamics, Inc., 515 F.2d 801, 811-13 (2d Cir.

1975) (brokerage firm liable where vice-president "occupied a prominent position within the

company," and "[b]y virtue of his position . . . was able for months to submit fictitious

quotations . . . in the firm's name," and where, therefore, the fraud "was in significant measure a

consequence of the employment relationship, which not only afforded [the fraudster] the

opportunity to submit the misleading quotations, but identified the firm as their source");

Hollinger, 914 F.2d at 1567-68 (brokerage firm liable where dealer used corporate facilities to

defraud investors); William H. Kuehnle, Secondary Liability under the Federal Securities Laws,

14 J. Corp. L. 313, 370 (1989) ("Courts have been inclined to apply agency liability mostly in

situations that are closest to the core of securities activities regulated by the securities laws.  The

conduct of employees of brokerage firms has been found to be particularly appropriate for the

application of agency principles because it involves activity that is critical to the securities

business and is based on trust in the principal" (footnotes omitted)).

Finally, the Court observes that Section 20(a) deals specifically with the liability of an

entity that "directly or indirectly, controls any person liable under" Section 10(b) or Rule 10b-5.

15 U.S.C. § 78t(a); see also id. § 77o (Section 15) (making controlling persons similarly liable

for Section 11 and Section 12 violations).  Unlike respondeat superior, Section 20(a) excuses the

"controlling" entity from liability where it is shown that it "acted in good faith and did not

directly or indirectly induce" the violation at issue. Id. § 78t(a).  While the Second Circuit, in line with other circuits, has held that the existence of section 20(a) "does not create a novel defense in cases otherwise governed by traditional agency principles," Marbury, 629 F.2d at 716, the fact that Congress expressly provided for controlling-person liability in Section 20(a), and chose to limit such liability by providing for a "good-faith" defense, at the very least counsels against novel and expansive applications of respondeat superior in this context.  Cf. In re Global Crossing, 2005 WL 1881514, at *3 (cautioning against use of common law principles such as respondeat superior in interpreting securities laws); Sharp v. Coopers & Lybrand, 649 F.2d 175, 182-83 (3d Cir. 1981) (emphasizing "strongly that the doctrine of respondeat superior, though applicable in this case, has not been and should not be widely expanded in the area of federal securities regulation"), overruled in part on other grounds by In re Data Access Sys. Secs. Litig., 843 F.2d 1537 (3d Cir. 1988) (in banc); Kuehnle, supra, at 370 (noting that "agency liability is an implied, not an explicit, basis of liability under the securities laws" and thus, "the application must be found to be fairly implied in terms of the purposes and policies of the federal securities laws").  For these reasons, Count XXVII of the Complaint is dismissed as to CIBC and World Markets.[6]

B.  Section 20(a) and Section 15 (Counts II and XIII)

Plaintiffs claim that CIBC is liable under Section 20(a) (Count II), and that both CIBC and World Markets are liable under Section 15 (Count XIII), due to their "control" over entities alleged to have violated Section 10(b) and Rule 10b-5 (in the case of the Section 20(a) claim),

---

[6] This Count also contains claims that defendants may be held liable for violations of Section 11 and 12(a)(2) by the CIBC designees.  (Compl. ¶ 1282.)  For the reasons stated above, those claims are also dismissed.

and Section 11 (in the case of the Section 15 claim).  Specifically, plaintiffs allege that CIBC

exercised control over the CIBC designees, and over GC itself (by virtue of substantial

stockholdings, a shareholder agreement that permitted CIBC's participation in certain large

transactions, and the participation of five CIBC designees on GC's seventeen to twenty member

board), and thus is liable under Section 20(a) for Section 10(b) and Rule 10b-5 violations

committed by these entities.[7]  CIBC is also alleged to be liable under Section 15 for allegedly

false registration statements attributable to GC.  (Compl. ¶¶ 1111-14, 1188.)  Plaintiffs claim

that both CIBC and World Markets violated Section 15 by virtue of their control over the CIBC

designees, who allegedly signed certain false registration statements.  (Id. ¶ 1188.)

Under Section 20(a):

> Every person who, directly or indirectly, controls any person
> liable under any provision of this chapter or of any rule or
> regulation thereunder shall also be liable jointly and severally
> with and to the same extent as such controlled person is liable,
> unless the controlling person acted in good faith and did not
> directly or indirectly induce the act or acts constituting the
> violation or cause of action.

15 U.S.C. § 78t(a).  Section 20(a) applies to primary violations of, inter alia, Section 10(b) and

Rule 10b-5.  Section 15 provides that:

> Every person who, by or through stock ownership, agency, or
> otherwise, or who, pursuant to or in connection with an agreement
> or understanding with one or more other persons by or through
> stock ownership, agency, or otherwise, controls any person liable
> under [Section 11 or Section 12(a)(2)], shall also be liable jointly

---

[7] The Complaint does not, at least expressly, plead CIBC's control *over the designees* as a basis for the Section 20(a) claim.  (Compl. ¶¶ 1111-14.)  Plaintiffs' memorandum, however, advances this theory (Pl.'s Mem. Opp. Mot. Dismiss at 3).  Because the Court ultimately holds that, in any event, plaintiffs have failed to state a Section 20(a) claim, this theory of liability will be addressed.

> and severally with and to the same extent as such controlled
> person to any person to whom such controlled person is liable,
> unless the controlling person had no knowledge of or reasonable
> ground to believe in the existence of the facts by reason of which
> the liability of the controlled person is alleged to exist.

Id. § 77o.  Section 20(a) and Section 15 are parallel provisions, and their "terms are interpreted

in the same manner."  In re Global Crossing, 322 F. Supp. 2d at 349.  To make out a claim

under either statute, the plaintiff must allege "(a) a primary violation by a controlled person, and

(b) control by the defendant of the primary violator."  Id.  To make out a claim under Section

20(a), but not Section 15, the plaintiff must also "allege culpable participation 'in some

meaningful sense' by the controlling person in the fraud."  Id., quoting Burstyn v. Worldwide

Xceed Group, Inc., No. 01 Civ. 1125, 2002 WL 31191741, at *7 (S.D.N.Y. Sept. 30, 2002).

"Control" may be pleaded in accordance with Rule 8(a)'s notice-pleading standard.  See In re

Parmalat Secs. Litig., 383 F. Supp. 2d 616, 627 & n.53 (S.D.N.Y. 2005).  A heightened

pleading requirement applies to the "culpable participation" element; the plaintiff "must plead

with particularity facts giving rise to a strong inference that the controlling person knew or

should have known that the primary violator, over whom that person had control, was engaging

in fraudulent conduct."  Id. (internal quotation marks omitted).

1.  Control

Defendants do not seriously contest (for purposes of this motion) the primary liability of

the CIBC designees or GC, so the first question is of CIBC and World Markets's control.

Control entails "'the power to direct or cause the direction of the management and policies of a

person, whether through the ownership of voting securities, by contract, or otherwise.'"  SEC v.

First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir.1996), quoting 17 C.F.R. § 240.12b-2.

"A plaintiff is required to prove actual control, not merely control person status." In re IPO Secs. Litig., 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003).

Plaintiffs' control allegations are sufficient. True, the fact that the CIBC designees were appointed by CIBC and were high-level employees of World Markets may not, taken alone, be enough to establish actual control of those individuals. And this Court has ruled previously in this case that Microsoft and Softbank's (1) minority stake in AGC, (2) shareholder agreement providing for veto authority over certain corporate actions, and (3) power to designate one member each to the AGC's board, were insufficient to allege control of AGC. See In re Global Crossing, 2005 WL 1881514, at *13. However, recent decisions, most notably the Second Circuit's ruling in Twombly v. Bell Atlantic Corp. (issued after this Court's prior ruling), emphasize that where Rule 8(a)'s pleading standard governs, dismissal is improper as long as the compliant furnishes adequate notice of the basis of the plaintiff's claim (a requirement clearly satisfied here) and "relief could be granted under [some] set of facts consistent with the allegations." Swierkewicz v. Sorema N.A., 534 U.S. 506, 512-14 (2002) (internal quotation marks omitted).[8] Therefore, even if the specific facts alleged by plaintiffs, taken alone, would

_____

[8] See also Twombly, 2005 WL 2420523, at *11 (holding in antitrust conspiracy context that facts alleged need only "include conspiracy among the realm of plausible possibilities" (footnote omitted)); In re IPO Secs. Litig., 241 F. Supp. 2d. at 352 (noting, in Section 15 context, that "[n]aked allegations of control . . . will typically suffice" and opining that after Swierkewicz, the court is "no longer convinced that even facts supporting a reasonable inference of control must be pleaded"); In re Vivendi Universal, S.A., 381 F. Supp. 2d 158, 187 (S.D.N.Y. 2003) ("While actual control and not just control status is needed to hold a person liable under § 15, naked allegations of control will typically suffice to plead an adequate § 15 claim to withstand a motion to dismiss under Rule 8" (internal quotation marks and alterations omitted)); In re Worldcom, Inc. Secs. Litig., 294 F. Supp. 2d 392, 415-16 (S.D.N.Y. 2003) ("A short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required.").

not be enough to establish actual control over the CIBC designees or GC, dismissal is improper as long as it is at least plausible that plaintiff could *develop* some set of facts that would pass muster. Applying this rule, we are not convinced that this case fits into that narrow category of cases in which it is "implausible" or mere "unlikely speculation" that plaintiffs can develop a record that would support a finding of control, Twombly, 2005 WL 2420523, at *11, especially given the "decidedly fact-based" nature of the control inquiry, In re Global Crossing, 322 F. Supp. 2d at 351. Because plaintiffs have adequately pleaded control over the CIBC designees and GC, and because the additional element of culpable participation need not be pleaded for a Section 15 claim, defendants' motion to dismiss is denied as to plaintiffs' Section 15 claim (Count XIII).[9]

### 2. Culpable Participation

_____As to the Section 20(a) claim, CIBC's culpable participation must be alleged in addition to control. Unlike control, which is subject only to Rule 8(a), the Private Securities Litigation Reform Act ("PSLRA") requires that plaintiffs "plead *with particularity* facts giving rise to *a strong inference* that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct." In re Global Crossing, 322 F. Supp. 2d at 349 (internal quotation marks omitted and emphases added). Here, plaintiffs assert that based on CIBC's alleged control of the designees and GC, "CIBC had

---

[9] With reference to the allegations concerning CIBC and World Markets's control over the CIBC designees, the Court notes that the fact that these allegations are insufficient to premise respondeat superior liability, see supra Part II.A.1, does not foreclose liability under the controlling-person statutes. See Hollinger, 914 F.2d at 1577 ("In enacting § 20(a), Congress expanded upon the common law, and in doing so, created a defense (the good faith defense) that would be available only to those who, under common law principles of respondeat superior, would have faced no liability at all.").

access to Global Crossing's internal financial material and thus was well aware of the misleading nature of the companies public statements," (Compl. ¶¶ 845) "had the ability to prevent the issuance of the statements or cause the statements to be corrected" (id. ¶ 1113), "had direct involvement in the day-to-day operations of" GC and "are presumed to have had the power to control or influence" the "transactions at issue" in this case. (Id. ¶ 1113.) Finally, plaintiffs allege that CIBC sold off its shares during the period at issue, and specifically that it sold a substantial block constituting its remaining GC shares as "private doubts" arose concerning the viability of GC's business plan. (Id. ¶ 845.)

These allegations fall short. Plaintiffs allege that at the very least, CIBC was aware of the misleading nature of the company's public statements and sold its shares at a time when insiders would know that GC was going downhill. However, aside from the allegedly suspicious timing of its stock sales (the last and largest of which coincided not only with private speculation about GC's peril, but with public discussion about telecom's financial woes, id. ¶¶ 180, 925), the conclusion that CIBC was aware (or should have been aware) of the fraud alleged arises solely from inferences drawn from the factual allegations supporting plaintiffs' claims of control: that CIBC designated five World Markets employees to sit on GC's seventeen-to-twenty member board, that it owned a large block of GC stock (though not a controlling share), and that CIBC subsidiaries provided financial services to GC on various occasions. While those allegations may be sufficient to plead a control relationship between CIBC, the CIBC designees, and GC under a pleading standard that demands little more than that the plaintiff provide notice to the defendant of the basis of its claims, they do not adequately allege that CIBC had access to inside information and awareness of fraud under a heightened standard that requires facts

supporting a *strong inference* of such culpability. That is not to say that allegations of control, coupled with the sale of a large block of shares, are always (or even generally) insufficient to plead culpable participation. What is determinative is the *strength* of the control allegations (and thus, the likelihood of access to inside information and awareness of fraud), and whether or not recognition of the plaintiff's claim would "collapse into a single requirement" the separate requirements of control and culpable participation. Maidstone, 2002 WL 31867724, at *12. In this case, plaintiffs' allegations of stock ownership, appointment of five board members, and possession of a stockholder agreement with limited powers – allegations similar to those previously rejected by this Court as adequately alleging even control, see In re Global Crossing, 2005 WL 1881514, at *13 – are insufficient to support a strong inference that CIBC knew or should have known about the fraud at issue in this case. Cf. Deutsche Telekom, 2002 WL 244597, at *2, *6-*8 (22% stock ownership of Deutsche Telekom stock and general allegations of access insufficient to support strong inference that defendant knew or should have known about fraud at Deutsche Telekom, where defendant also sold 200 million shares in Deutsche Telekom offering in period before fraud was revealed); Maidstone, 2002 WL 31867724, at *12 (50-75% ownership of shares in corporation, though enough to support an inference of control, "not enough to infer knowledge or recklessness"). Plaintiffs' Section 20(a) claim (Count II) against CIBC is dismissed.

C. Insider Trading (Count I)

Plaintiffs also claim that CIBC is liable under Section 10(b) and Rule 10b-5(a) and (c) for direct participation in the "unlawful scheme to defraud investors" at GC. (Pl.'s Mem. Opp. Mot. Dismiss at 20.) While plaintiffs' memorandum, in a summary section, makes broad claims

regarding CIBC's involvement in that fraud (id. at 21), the one-page argument section on the participation claim argues only that CIBC is liable for insider trading (id. at 27). For that reason, the Court will not address any larger claim of participation. See Fezzani v. Bear, Stearns & Co., Inc., 384 F. Supp. 2d 618, 645 n.7 (S.D.N.Y. 2004) (holding claim waived where complaint was ambiguous and plaintiff failed to advance claim in memorandum of law). See generally In re Global Crossing, Ltd. Secs. Litig., 322 F. Supp. 2d 319, 335-37 (S.D.N.Y. 2004) (holding plaintiffs adequately pleaded "participation" claim against Arthur Andersen, where firm was alleged to have orchestrated fraud at GC).

Insider trading, like other fraudulent and deceptive acts subject to liability under Section 10(b) and Rule 10b-5, is subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b), not the liberal notice-pleading standard of Rule 8(a). See, e.g., Log On Am., Inc. v. Promethean Asset Mgm't L.L.C., 223 F. Supp. 2d 435, 447 (S.D.N.Y. 2001). Even under the "relaxed" standard applied by some courts in this context, compare SEC v. Ballesteros Franco, 253 F. Supp. 2d 720, 732 (S.D.N.Y. 2003) ("In the context of an insider trading claim, the specific facts with respect to the insider tips are often within the control and knowledge of the defendants, and therefore, Rule 9(b) is less stringent, so as to allow circumstantial evidence to plead the specific content and circumstance of insider tips" (internal quotation marks omitted)) with Log On Am., 223 F. Supp. 2d at 447 (requiring plaintiff to "provide adequate specifics regarding the circumstances surrounding Defendants' possession of non-public information"), Rule 9(b) requires that "the complaint 'adduce specific facts supporting a strong inference of fraud.'" Energy Factors Inc. v. Nuevo Energy Co., No. 91 Civ. 4273, 1992 WL 170683, at *3 (S.D.N.Y. July 7, 1992), quoting Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir.

1990).  In this case, the facts alleged in support of plaintiffs' insider trading claim are identical to the facts alleged in support of the Section 20(a) claim; for the same reasons, those facts do not support a "strong inference" that CIBC not only had access to inside information about GC's true financial status but was in receipt of such information when it sold its GC shares in 1999 and 2000.  Count I of the Complaint is dismissed as to CIBC.

D.  <u>Section 12(a)(2) (Count XVI)</u>

Finally, plaintiffs claim that CIBC is liable under Section 12(a)(2) for the sale of 6.77 million shares in the April 2000 Secondary Offering, a "firm commitment" offering in which Global Crossing and several shareholders, including CIBC, sold their shares to underwriters who in turn sold shares to the investing public (Count XVI).  (Compl. ¶¶ 506-07, Pl.'s Mem. Opp. Mot. Dismiss at 36-38, Def.'s Mem. Supp. Mot. Dismiss at 33-35.)[10]  <u>See generally</u> <u>Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.</u>, 32 F.3d 697, 701 (2d Cir. 1991) (describing characteristics of firm commitment offering).  In connection with this offering, Global Crossing filed a Registration Statement that was signed by GC's directors, including the CIBC designees. (Compl. ¶¶ 507-09.)

Section 12(a) states that:

> Any person who . . .
>
> (2) offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material

---

[10]  The Complaint refers to CIBC alternatively as a "Selling Shareholder" (Compl. ¶ 506) and "Underwriter" (<u>id</u>. ¶ 834) in the Secondary Offering.  The Complaint also states that CIBC sold its shares "directly to the investing public" (<u>id</u>. ¶ 105).  However, in its memorandum in opposition to CIBC's motion, plaintiffs all but concede that CIBC sold its shares to the underwriters and not to the aggrieved shareholders themselves.  (Pl.'s Mem. Opp. Mot. Dismiss at 36-38; <u>see</u> <u>also</u> Compl. ¶ 510.)

> fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission . . .

> shall be liable . . . to the person purchasing such security from him[.]

15 U.S.C. § 77l. Plaintiffs's 12(a)(2) claim is based on CIBC's inadequate investigation of the statements made in the Registration Statement (and Prospectus) filed by GC and its sale of shares through the Offering. (Compl. ¶¶ 507-09, 1204-06.) CIBC responds that it cannot be held liable because it does not qualify as a seller under Section 12(a)(2).

To state a claim under Section 12(a)(2), the plaintiff must adequately allege a "buyer-seller relationship" between himself and the defendant. See Capri v. Murphy, 856 F.2d 473, 478 (2d Cir. 1988). A "seller" is one who "either (1) passed title of the security to the plaintiff or (2) successfully solicited the purchase motivated at least in part by his own financial interest." In re Deutsche Telekom AG Secs. Litig., No. 00 Civ. 9475, 2002 WL 244597, at *3 (S.D.N.Y. Feb. 20, 2002), citing Pinter v. Dahl, 486 U.S. 622, 642, 647 (1988); Wilson v. Saintine Exploration & Drilling Corp., 872 F.2d 1124, 1126 (2d Cir. 1989); Capri, 856 F.2d at 478. Here, it was the underwriters, not CIBC, who directly sold shares to plaintiffs. Thus, "because 'a buyer cannot recover from a seller's seller,' the first test of who is a seller pursuant to section 12(a)(2)" cannot be satisfied. Deutsche Telekom, 2002 WL 244597, at *4 (quoting Pinter, 486 U.S. at 644 n.21).

As for the "successful solicitation" prong, even an indirect seller may be liable under 12(a)(2) if it "actively solicit[ed] the sale of securities and . . . as a result of those solicitations, plaintiffs purchased the securities." Id. Active solicitation may be demonstrated if the seller

signs a registration statement filed in connection with an offering and had a financial interest in the sale. See, e.g., id. at *5; Steed Fin. LDC v. Nomura Sec. Int'l, Inc., No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept 20, 2001); APAC Teleservices, Inc. Sec. Litig., No. 97 Civ. 9145, 1999 WL 1052004, *11 (S.D.N.Y. Nov. 19, 1999); but see Rosenzweig v. Azurix Corp., 332 F.3d 854, 871 (5th Cir. 2003) (no active solicitation where seller in firm commitment underwriting signed Registration Statement). Plaintiffs' sole argument is that because the CIBC designees signed the Registration Statement filed by GC in connection with the Offering, and because CIBC "had a tremendous financial interest in soliciting the sale of Global Crossing securities," CIBC may be deemed to have actively solicited the sale of its shares. (Pl.'s Mem. Opp. Mot. Dismiss at 38.) While CIBC undoubtedly had a substantial financial interest in the sale of its GC shares, the Registration Statement was signed by the CIBC designees in their capacities as members of GC's Board. Plaintiffs' argument that CIBC should be held automatically liable for that conduct is simply a reprise of its respondeat superior argument, and it fails for the same reasons. See supra Part II.A.1. For this reason, Count XVI of the Complaint is dismissed as to CIBC.

## CONCLUSION

Plaintiffs' motion for default judgment as to CIBC World Markets Corp., CIBC Capital Partners, and CIBC Capital Partners (Cayman), is denied. Defendants' motion to dismiss is granted in part and denied in part.

SO ORDERED.

Dated: New York, New York
       November 4, 2005

GERARD E. LYNCH
United States District Judge