UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x
                         :

In re GLOBAL CROSSING, LTD.         :         02 Civ. 910 (GEL)
SECURITIES LITIGATION          :
                         :        **OPINION AND ORDER**
--------------------------------------------------------------x

Grant & Eisenhofer, P.A., Wilmington, DE (Jay W. Eisenhofer, Sidney S. Liebesman, Michael J. Barry, Michelle T. Wirtner, Sharan Nirmul), for Lead Plaintiffs Public Employees Retirement System of Ohio and State Teachers Retirement System of Ohio.

Sidley Austin Brown & Wood LLP, New York, NY & Chicago, IL (Daniel A. McLaughlin, Charles W. Douglas, David F. Graham, James W. Ducayet), for Defendant Microsoft Corporation.

Sullivan & Cromwell LLP, New York, NY & Los Angeles, CA (Robert A. Sacks, Bradley A. Harsch, Stephen J. Shin), for Defendant Softbank Corporation.

GERARD E. LYNCH, District Judge:

      In yet another chapter of this litigation concerning alleged accounting improprieties and other fraud at Global Crossing, Ltd. ("GC") and its affiliate Asia Global Crossing Ltd. ("AGC"), Lead Plaintiffs seek to amend the Second Amended Consolidated Class Action Complaint ("Complaint" or "Second Amended Complaint") as to defendants Microsoft Corporation and Softbank Corporation, contending that newly discovered information (further) shows the companies' involvement in the fraud at AGC. Defendants oppose the proposed amendments, contending that they are futile, and specifically that they fail to address the deficiencies that led this Court to previously dismiss all claims against Microsoft and Softbank. See In re Global Crossing Ltd. Secs. Litig. (Microsoft/Softbank Ruling), No. 02 Civ. 910, 2005 WL 1907005

(S.D.N.Y. Aug. 8, 2005). For the following reasons, plaintiffs' motion to amend the complaint will be granted in part and denied in part.[1]

## BACKGROUND

The allegations of fraud at GC and AGC are described in detail in the Court's prior opinions and need not be repeated here. See, e.g., Microsoft/Softbank Ruling, 2005 WL 1907005; In re Global Crossing Ltd. Secs. Litig. (Andersen Ruling), 322 F. Supp. 2d 319 (S.D.N.Y. 2004); In re Global Crossing Ltd. Secs. Litig. (GC Underwriters Ruling), 313 F. Supp. 2d 189 (S.D.N.Y. 2003). Facts particular to the claims against Microsoft and Softbank are set forth below, taken primarily from allegations in the complaint, and are accepted as true for the purposes of this motion. See Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995).

On September 24, 1999, AGC was formed as a holding company for GC's Asian operations, and two months later, on November 24, it became a wholly-owned subsidiary of a joint venture among GC, Microsoft, and Softbank. (Id. ¶ 200.) As part of this deal, GC, Microsoft, and Softbank entered into a Shareholder Agreement that gave each company the right to appoint one of AGC's directors. (Id. ¶ 205.) Microsoft and Softbank in turn invested $175 million and committed to purchase $100 million in telecommunications capacity from AGC over a three-year period. (Id. ¶ 206.) Following AGC's October 2000 IPO, Microsoft and Softbank

---

[1] Plaintiffs also moved to amend the Complaint as to defendants Canadian Imperial Bank of Commerce ("CIBC") and CIBC World Markets Corp. See In re Global Crossing Ltd. Secs. Litig. (CIBC Ruling), 02 Civ. 910, 2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005). However, the Court has been informed that Lead Plaintiffs and the CIBC defendants have reached a settlement in principle resolving all potential claims against these defendants. The portion of plaintiffs' motion that applies to the CIBC defendants is therefore deemed withdrawn, without prejudice to its reinstatement if the settlement is ultimately not consummated.

each became owners of 15.8% of AGC's common stock.  (Id. ¶ 207.)

Pursuant to the Shareholder Agreement, in November 1999, Softbank designated Eric Hippeau, President and Executive Managing Director of Softbank International Ventures (as well as a member of the GC board of directors from September 1999 to November 2001) to serve on the AGC board of directors, which he did until November 2001 (Compl. ¶ 53); in April 2000, Microsoft designated Thomas U. Koll, Vice President of Network Solutions at Microsoft, to serve on the board (id. ¶ 67); and in February 2001, Microsoft appointed Peter Knook, also a Microsoft Vice President, to take Koll's place (id. ¶ 59).  During the relevant period, AGC's board was comprised of twelve directors.  Microsoft/Softbank Ruling, 2005 WL 1907005, at *13.

Prior to the current proposed amendment to the Complaint, plaintiffs' theory of Microsoft's and Softbank's liability was not that these companies committed any fraudulent acts themselves, but rather that they are liable for the fraudulent actions of their board designees, and of AGC itself, under the agency principle of respondeat superior, and as "controlling entities" under certain federal securities statutes.  The underlying liability of the board designees and AGC related to alleged accounting improprieties concerning sales and exchanges of bandwidth by AGC.  This Court dismissed claims based on these theories, holding that plaintiffs failed to allege facts from which it could be inferred that either Microsoft or Softbank controlled their respective board designees or AGC itself, and thus failed to properly allege either agency or control-person status.  See id. at *9-*11, *13-*14.  The Court's rulings were grounded in the view that minority shareholder status and the power to appoint a director (even where a high-level employee is appointed who has the power to veto certain extraordinary corporate actions

under the governing shareholder agreement) are insufficient to plead control, absent "concrete factual allegations" as to how control was actually exercised over the director or alleged fraudulent enterprise. The Court emphasized that "when acting as directors of AGC, Koll, Knook, and Hippeau had fiduciary duties to act on behalf of the shareholders of AGC itself, not on behalf of the entities that appointed them. Thus, when they acted as directors of AGC, they were not acting within the scope of their employment with Microsoft and Softbank." Id. at *3. In a subsequent ruling addressing similar allegations as to the CIBC defendants, see supra note 1, the Court reaffirmed its ruling on agency liability, noting specifically the misfit between common-law agency principles and the federal securities laws, see CIBC Ruling, 2005 WL 2990646, at *6. However, the Court retreated on the issue of control-person liability, because an intervening Second Circuit decision clarifying the burden of pleading imposed by Fed. R. Civ. P. 8(a) precluded dismissal. Id. at *8.

Plaintiffs did not move the Court to reconsider its prior holding as to Microsoft and Softbank in light of the CIBC Ruling, but instead moved forward on an already-pending motion to amend the Complaint on the basis of new information obtained in course of further investigation into the affairs of GC and AGC. The fruits of that investigation are contained in what is denominated the Proposed Third Amended Consolidated Class Action Complaint ("TAC"). In a nutshell, the proposed amendments in the TAC concern a publicized purported agreement among Microsoft, Softbank, and AGC in connection with the AGC IPO, whereby Microsoft and Softbank each agreed to purchase $100 million of bandwidth on the not-yet completed AGC network (the "November 24, 1999, Capacity Commitment Agreement" or "CCA"). (TAC ¶ 1215; Liebesman Decl. Ex. 4.) Plaintiffs allege that neither Microsoft nor

4

Softbank had any intention of honoring their obligations under the CCA (TAC ¶¶ 1206-1209, 1220-23, 1257-69), and that directly and through their agents on AGC's board, they negotiated under the table to avoid those obligations, keeping the negotiations secret in order to maintain the attractiveness of AGC stock to potential investors. (Pl. Mem. 12-16; TAC ¶¶ 1206-08, 1210, 1224, 1243, 1246, 1248, 1252-54, 1257-69, 1278-80.)

Based on these actions, plaintiffs allege that Microsoft and Softbank intentionally led AGC investors to believe that their investments were backed by a guaranteed $200 million revenue stream for AGC. This revenue stream was important because AGC had reported only $130 million in sales for the nine months preceding its IPO. (TAC ¶ 1206.) Plaintiffs allege that Softbank ultimately "purchased only $14.5 million of the $100 million in capacity that Asia Global Crossing and Softbank had touted to Asia Global Crossing investors" (id. ¶ 1225), that Microsoft purchased only $20 million of the $100 million in capacity it had pledged to buy (id. ¶ 1269), and that the crash of AGC's stock during 2001 and 2002 is directly "attributable to Microsoft and Softbank's failure to provide the promised revenue stream." (E.g., id. ¶ 1306.) On the strength of these new allegations, plaintiffs propose to add the following claims for relief against Microsoft and Softbank:

> Claims under Section 10(b) (15 U.S.C. § 78j(b)), based on false statements and the alleged scheme relating to the CCA (Counts XXXVII to XL; TAC ¶¶ 1601-1648);
>
> Respondeat superior claims under Section 10(b), Rule 10b-5, and Section 11 (15 U.S.C. § 77k) based on the primary violations of these statutes by Hippeau (Softbank) and Koll (Microsoft) (Counts XLI, XLII, XLVII, XLVIII; TAC ¶¶ 1649-1668, 1697-1708); and
>
> Control-person claims under Section 20(a) (15 U.S.C. § 78t) and Section 15 (15 U.S.C. § 77o) based on primary violations of Section 10(b) and Section 11 by Hippeau, Koll, and AGC itself

(Counts XLIII to XLVI; TAC ¶¶ 1669-1696).

## DISCUSSION

Microsoft and Softbank vigorously object to plaintiffs' proposed amendments to the complaint, primarily on the ground that they are "futile," that is, that the proposed additional claims are still legally inadequate.[2] Ellis v. Chao, 336 F.3d 114, 127 (2d Cir. 2003). Such objections are reviewed similarly to a motion to dismiss for failure state a claim under Fed. R. Civ. P. 12(b)(6). See, e.g., Aetna Casualty & Surety Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 604 (2005). When reviewing a 12(b)(6) motion to dismiss, the Court must accept "as true the facts alleged in the complaint," Jackson Nat'l Life Ins. Co. v. Merrill, Lynch & Co., 32 F.3d 697, 699-700 (2d Cir. 1994), and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Thomas v. City of New York, 143 F.3d 31, 36 (2d Cir. 1998) (citations omitted). The Court may consider "'any written instrument attached to [the complaint] as an exhibit,' 'any statements or documents incorporated in it by reference,' and any document not incorporated but that is, nevertheless, 'integral' to the complaint because the complaint 'relies heavily upon its terms and effect.'" Yung v. Lee, 432 F.3d 142, 147 (2d Cir. 2005), quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002). The Court may also take judicial notice of matters of

---

[2] Defendants also argue that the Court should deny leave to amend without regard to the merit of the proposed amended claims, based on statements in certain cases to the effect that liberally allowing amendment may be inappropriate in the securities fraud context. See, e.g., In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 273 F. Supp. 2d 351, 393 (S.D.N.Y. 2003). It is enough to say that the Court is not convinced that a "heightened" standard for amendment should apply in this case, and that if the proposed amended claims have merit, the Court is prepared to entertain them. See Foman v. Davis, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by the plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.").

public record, including the contents of documents required to be filed with the SEC.  <u>Kramer v. Time-Warner, Inc.</u>, 937 F.2d 767, 774 (2d Cir. 1991).  All reasonable inferences are to be drawn in the plaintiff's favor.  <u>See</u> <u>In re Indep. Energy Holdings PLC</u>, 154 F. Supp. 2d 741, 747 (S.D.N.Y. 2001).

I.    <u>Plaintiff's Respondeat Superior Claims</u>

Microsoft and Softbank argue that the respondeat superior claims fail because of a partial settlement that fully releases the Microsoft and Softbank board designees, Koll and Hippeau, from liability.  The theory is that because Microsoft's and Softbank's liability on the respondeat superior claims is entirely derivative of Koll and Hippeau,[3] the release of these employees is necessarily a release of their employers.  (Microsoft Mem. 17-19; Softbank Mem. 20-21.)  This is so, it is argued, despite language in the settlement agreement that expressly reserves all rights against non-settling defendants including Microsoft and Softbank.  March 19, 2004, Stip. of Stlmt. ¶ 1.E.nnnnnnnn.  The Court agrees, and will deny leave to amend as to the respondeat superior claims.

The parties point to no federal statute or federal common-law ruling addressing this issue, and the Court has found none.  However, Microsoft and Softbank note that the majority state common-law rule,[4] and the rule adopted by the most recent Restatement,[5] is that settlement with

---

[3]  The TAC does not implicate Koll's successor on the AGC board, Peter Knook, in the respondeat superior or control claims.

[4]  <u>See</u> 2A C.J.S. <u>Agency</u> § 436; 10 William Meade Fletcher, <u>Fletcher Cyclopedia of Private Corporations</u> § 4898; <u>Williams v. Vandenberg</u>, 620 N.W.2d 187, 189 (S.D. 2000); <u>Horejsi v. Anderson</u>, 353 N.W.2d 316, 317 (N.D. 1984); <u>Dickey v. Meier's Estate</u>, 197 N.W.2d 385, 388 (Neb. 1972)

[5]  <u>See</u> Restatement (Third) of Torts: Apportionment of Liability §§ 7 cmt. j, 16 cmt. d & Reporter's Note cmt. d (2000).

an employee extinguishes the liability of the employer where the employer's liability is based on respondeat superior. This rule has been held to apply even where claims against the employer are expressly reserved in the settlement agreement.[6] The primary (though not only) rationale for Restatement rule is that where an employer is "liable solely on the basis of [an employee's] tortious conduct," such as in the case of a respondeat superior claim, "there is no direct responsibility to assign to the party to whom liability is imputed," that is, the employer. Restatement § 7 cmt. j. Instead, the employee and employer "are treated as a single unit for the assignment of responsibility" among the alleged tortfeasors, id., with the employee's share of responsibility constituting the entire share of both the employee and employer.

This rationale takes on additional significance in the context of federal securities law: Under the PSLRA, in certain circumstances (including this one), settlement with the employee, no matter the amount of the settlement, reduces any subsequent judgment against the non-settling defendants by the amount corresponding to the share of responsibility of the employee, and thus also of the employer. See 15 U.S.C. § 78u-4(f)(7)(B). Because the employee's share of responsibility is wiped out, "there is no responsibility remaining to be assigned" to the employer, and the Restatement posits that the employer's release is not only warranted as a policy matter, but demanded as "logically required." Id. § 16 Reporter's Note cmt. d.

None of plaintiffs' arguments undermine defendants' claim that this rule is "logically required," as the Restatement posits, or suggests that application of the rule would be undesirable

---

[6] See Fletcher, supra, § 4898; see also, e.g., Williams, 620 N.W.2d at 189-91; Biddle v. Sartori Mem. Hosp., 518 N.W.2d 795, 798 (Iowa 1994); Theophelis v. Lansing Gen. Hosp., 424 N.W.2d 478, 480 (Mich. 1988) (plurality opinion); Dickey, 197 N.W.2d at 388; Bacon v. United States, 321 F.2d 880, 884 (8th Cir. 1963) (interpreting Missouri law).

as a policy matter. The arguments that plaintiffs *do* make are unsound even on their own terms.

Plaintiffs first argue, without explanation or authority, that "state common law, non-securities cases from other jurisdictions involving a principal's right to recover for the torts of its released agent . . . simply do[] not apply to securities class action lawsuits." (Softbank Reply 14.) However, as Microsoft correctly points out, that plaintiffs' claims happen to arise under the federal securities laws, and are part of a class action, is irrelevant: "[D]octrines of agency and respondeat superior are common law doctrines used to establish vicarious liability under both common law and statutory causes of action. As such, the common law principles . . . apply to the liability of a principal regardless of the underlying substantive basis of legal liability of the agent." (Microsoft Mem. 18.) As for the reference to "state" common law, there does not appear to be any relevant federal statutory or common-law authority on point, and for this reason the Court must by necessity refer to state common-law rulings as persuasive authority in analyzing the respondeat superior issue. Ultimately, this argument is nothing but a subtle attempt by plaintiffs to take the sweet without the bitter, to import common-law principles like respondeat superior into the federal securities context (which the Court previously expressed hesitation about doing, see Microsoft/Softbank Ruling, 2005 WL 1907005, at *3; CIBC Ruling, 2005 WL 2990646, at *5-*6), while at the same time demanding that traditional limitations on those doctrines be ignored. Such selective adoption of common law principles cannot be justified.

Second, plaintiffs appear to suggest that adopting the Restatement rule in this context, and denying leave to amend as to the respondeat superior claims, would constitute judicial "rewriting" of the settlement agreement. (Softbank Reply 14.) That argument is without merit.

Judicial resolution of uncertain legal issues regarding the effect of a settlement agreement does not rewrite the parties' agreement. Plaintiffs respond that even if that is so, nullification of the purported "reservation" of claims against Microsoft and Softbank in the settlement agreement warrants rescission of that agreement. (Microsoft Reply 11.) While a mistake of fact or law by the parties may under certain circumstances warrant rescission of a contract, see Restatement (Second) of Contracts §§ 151-58, that doctrine is inapplicable where, as here, there is no mistake, but rather subsequent resolution of an undetermined point of law. As the Second Circuit has pointed out, "[s]uccinctly put, a settlement payment, made when the law was uncertain, cannot be successfully attacked on the basis of any subsequent resolution of the uncertainty." Anita Foundations, Inc. v. ILGWU Nat. Retirement Fund, 902 F.2d 185, 189 (2d Cir. 1990) (quotation marks omitted) (noting also that "uncertainty of a legal position and the desire to avoid the risk of a lawsuit are the impetus for many out-of-court settlements. It simply is inappropriate to equate these settlement agreements with agreements premised upon the misapplication of settled legal principles").

Finally, there is some suggestion in plaintiffs' papers, though the argument is never made expressly, that the release defense advanced by Microsoft and Softbank should be deemed waived. (Softbank Reply 13; Microsoft Reply 10-11.) True enough, neither Microsoft nor Softbank raised this defense at any prior stage of this litigation, including in connection with their motion to dismiss the Second Amended Complaint.[7] This has forced the court to write

---

[7] While defendants claim that the settlement was ratified after briefing was complete on the prior motion to dismiss (Microsoft Mem. 17), they could easily have sought leave to file a sur-reply in order to bring this argument to the Court's attention, and such leave would certainly have been granted.

twice, unnecessarily, on the application of respondeat superior in the federal securities law context, and has wasted tens if not hundreds of hours of the parties' time on briefing the issue.

Nevertheless, for the following reasons, the Court will exercise its discretion to address the merits of the defense. As an initial matter, plaintiffs suggest that defendants' failure to object to the settlement agreement at the time it was ratified by the Court waived the release defense. (Softbank Reply 13; Microsoft Reply 11.) However, it is not clear that defendants would have had standing to make such an objection at that time, especially for the sole purpose of obtaining an advance ruling as to what implications a particular provision in the settlement agreement had for them. See Joseph M. McLaughlin, McLaughlin on Class Actions, at 6-31 to 6-32 (2004) (noting "[g]enerally, non-settling defendants lack standing to object to a partial settlement, because their rights are usually not affected by the settlement," and citing cases holding non-settling defendants have standing only where they can demonstrate formal legal prejudice as a result of the settlement). Moreover, the Court would likely not have resolved the issue at that stage of the proceedings in any event, see id. at 6-39; Carson v. Am. Brands, Inc., 450 U.S. 79, 88 n.14 (1981) (noting court need not "decide the merits of the case or resolve unsettled legal questions" in determining litigation risks for purpose of determining fairness of settlement). In any event, if anyone should be charged for not having raised issues concerning the legal import of the release provisions in the agreement at the time of ratification, it is the parties to the agreement, that is, the plaintiffs, not non-parties such as Microsoft and Softbank.

More relevant is defendants' failure to raise the release defense in the course of briefing their prior motion to dismiss the Second Amended Complaint. On this score, aside from pointing out in an off-hand matter that Softbank did not previously raise this defense (Softbank

Reply 13), plaintiffs make no effort to advance any waiver argument against defendants based on the failure to raise the defense in the course of briefing that motion. For this reason, there is a real issue as to whether plaintiffs have "waived" the waiver argument. More importantly, while the Court acknowledges that time and resources have been wasted by the belated assertion of this defense, dismissal of an argument on the basis of waiver is disfavored where there is no attempt to show that the argument also lacks substantive merit. As previously discussed, while plaintiffs make a number of arguments, they do not address, let alone dispute, the merit of the Restatement rule. For this reason, the Court declines to deem the defense waived, and leave to amend the complaint as to the respondeat superior claims is denied.

However, the Court emphasizes that this defense is inapplicable to any claim in which Microsoft's and Softbank's alleged liability is not entirely derivative of Koll's and Hippeau's, but rather where the companies are alleged to be independently liable for harm caused to plaintiffs. That includes the statutory control-person claims under Section 15 and 20(a), as Microsoft expressly concedes (Microsoft Mem. 18). <u>See</u> Restatement § 7 cmt. j. Those claims, if proved, provide a mechanism for plaintiffs to hold Microsoft and Softbank liable for the primary conduct of Koll and Hippeau.

II.     <u>Section 10(b), 15, and 20(a) Claims</u>

In addition to respondeat superior claims, plaintiffs assert Section 10(b) claims based on allegations of Microsoft's and Softbank's primary fraudulent conduct,[8] and control-person

---

[8] Microsoft suggests that the Section 10(b) claims rely solely on the primary conduct of Koll and Hippeau. (Microsoft Mem. 16 n.8.) If so, the claims would either be futile in light of the rejection of plaintiffs' respondeat superior claims above, or subsumed by the Section 20(a) control-person claims. It is not so, however: The TAC expressly bases the Section 10(b) claims on Microsoft's and Softbank's direct involvement in fraud at AGC. (TAC ¶¶ 1601-48.)

claims under section 15 and section 20(a), based on alleged primary violations of Section 11 and Section 10(b) by Hippeau, Koll, and AGC itself.

A.    <u>Scope of Plaintiffs' Claims</u>

At the outset, it is necessary to determine the intended scope of the claims asserted against Microsoft and Softbank in the TAC. Microsoft and Softbank were charged in the Second Amended Complaint with responsibility for certain accounting improprieties, relating to the sale and exchange of bandwidth in so-called "IRUs." That alleged conduct still constitutes the primary basis of plaintiffs' case against the remaining defendants. However, the factual predicate of the allegations against Microsoft and Softbank in the TAC center on a separate and distinct matter: Microsoft's and Softbank's secret negotiations with AGC concerning their capacity purchase commitments under the CCA. This change in focus raises the question as to whether plaintiffs still intend to advance any theory of liability against defendants related to accounting issues, or whether the sole issue for the Court is misconduct relating to the CCA. The Court takes the latter view.

The specification of the claims against Microsoft and Softbank in the TAC, while ambiguous, supports the view that plaintiffs' claims are limited to the CCA. Those claims make specific mention only of misconduct relating to the CCA, and do not discuss accounting fraud or IRU swaps. And notably, while the description of the respondeat superior claims in a black-lined version of the TAC supplied by plaintiffs makes reference to parts of the TAC discussing IRU swaps (Liebesman Aff. Ex. 2 ¶¶ 1699, 1705), the final version omits those references (<u>id</u>.

Ex. 1 ¶¶ 1699, 1705.)[9]

More importantly, defendants' memoranda in opposition to the proposed amendments explicitly point out that none of the new factual allegations relate to the accounting issues that characterized the Second Amended Complaint (e.g., Microsoft Mem. 22; Softbank Mem. 2), but plaintiffs' responsive memoranda make no specific mention of any matter other than the CCA. In fact, in reply to Softbank's argument that plaintiffs fail to adequately allege scienter in support of their Section 10(b) and Section 20(a) claims, to the extent that the claims arise out of allegedly fraudulent IRU-swap transactions (Softbank Mem. at 18), plaintiffs state that "[t]he Court should simply disregard Softbank's argument that plaintiffs have not pled scienter in connection with the accounting issues which form the basis of plaintiffs' claims concerning swap transactions in the SAC and TAC" because "this is not the theory advanced against Softbank in the TAC." (Softbank Reply 9 n.4; see also id. at 12-13 (characterizing as "Softbank's violation of the federal securities laws" solely concealment of secret agreement and participation in CCA scheme).

Plaintiffs cannot stay mum on additional theories of liability (and indeed disclaim reliance on such theories as to certain claims) and expect the Court to evaluate and rule on them, especially where there is a serious question as to whether plaintiffs' new allegations adequately support those theories. Accordingly, the Court grants plaintiffs' request to "disregard" arguments relating to accounting fraud and to focus instead on the CCA. Any theory of

---

[9] Both versions of the TAC reference paragraphs 640-48 as describing fraudulent statements that can be attributed to Softbank (TAC ¶ 1653), in support of plaintiffs' Section 11 claim against Softbank. The Court assumes that this reference is a typographic error, considering that paragraphs 640-48 relate to fraudulent statements concerning Global Crossing, and not *Asia* Global Crossing.

Microsoft's and Softbank's liability not relating to those companies' capacity purchase obligations under the CCA is deemed abandoned.

B.    Loss Causation

It is undisputed that plaintiffs must plead and prove loss causation – that defendants' alleged misconduct caused the economic harm suffered by plaintiffs – to make out their claims under Section 10(b) and 20(a), see Dura Pharms., Inc. v. Broudo, 544 U.S. 366, 125 S. Ct. 1627, 1631-33 (2005); Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir. 2005), and that lack of loss causation is an affirmative defense to a claim under Section 11 and Section 15 (but can be considered on a motion to dismiss to the extent that it is claimed that lack of loss causation is apparent on the face of the complaint), see In re Merrill Lynch Secs. Litig., 272 F. Supp. 2d 243, 253-54 (S.D.N.Y. 2003).[10]  As applied to this case, the elements of loss causation are (1) that the market reacted negatively to a corrective disclosure regarding the falsity of prior statements relating to Microsoft's and Softbank's obligations under the CCA; or (2) that risks that were concealed by the alleged misrepresentations or omissions materialized and proximately caused plaintiffs' loss.  Lentell, 396 F.3d at 175.

Plaintiffs' theory of loss causation is that AGC's stock price was "massively inflated" during the relevant period "as the result of Microsoft's and Softbank's long-standing, comprehensive scheme to misrepresent Asia Global Crossing's current and anticipated future revenues through published representations that both companies had contracted to supply AGC – a new company which had reported only $130,455,000 in sales for the nine months preceding its

_____

[10]  The control-person claims under Section 15 and 20(a) require a primary violation of Section 11 and 10(b), respectively.  The loss causation requirements for claims under the primary statutes, therefore, also apply to claims under the control-person statutes.

IPO – with an aggregate $200 million revenue stream when, in fact, Softbank and Microsoft never intended to honor their respective contracts and never did so." (TAC ¶ 1297.) Plaintiffs claim that "[b]ut for Microsoft and Softbank's misrepresentations that they had contracted to purchase $200 million in capacity from Asia Global Crossing, plaintiffs would not have purchased shares of Asia Global Crossing, or would not have purchased them at the artificially inflated prices at which they were offered." (Id. ¶ 1298.) Plaintiffs allege that this "fraudulent scheme" "was gradually revealed to the market through [AGC's] release of financial information, which disclosed that the promised revenues from Microsoft and Softbank were not being received" and that the "receipt of this information caused progressive declines in the price of Asia Global Crossing stock." (Id. ¶ 1299.) While AGC's financial statements from February 12, 2001 to October 24, 2002, "did not admit to the missing Microsoft and Softbank revenues," those revenues were missing nonetheless and the market absorbed the failure of expected revenues from Microsoft and Softbank to materialize. (Id. ¶¶ 1299, 1300, 1301, 1302, 1303, 1304.) It is alleged that "[o]n November 17, 2002, Asia Global Crossing filed for bankruptcy, in substantial part because of the missing Softbank-Microsoft revenues." (Id. ¶ 1305.) Plaintiffs thus claim that "the declines in the Company's stock price [between February 12, 2001 and October 24, 2002] are attributable to Microsoft and Softbank's failure to provide the promised revenue stream." (Id. ¶ 1306.)

Plaintiffs have properly alleged loss causation as to both defendants, if just barely. Microsoft argues, based on the text of the CCA and other public CCA disclosures, that under the CCA, it was committed to purchase $100 million in network capacity in three separate "tranches," the final $80 million payment being due on December 31, 2002, which was *after* the

stock price declines that plaintiffs blame on Microsoft's and Softbank's misdealings. (Microsoft Mem. 6, <u>citing</u> CCA §§ 1, 2(b)(iii), Liebesman Decl. Ex. 4; AGC IPO Prospectus at 35, Liebesman Decl. Ex. 1). And it is undisputed that Microsoft fulfilled its $20 million in commitments under the first two tranches. (TAC ¶ 1269; Microsoft Mem. 7.)

Microsoft argues that plaintiffs cannot plead loss causation as to it. It points out that plaintiffs' theory – that from February 12, 2001, to October 24, 2002, the market began to respond to the absent revenue owing from Microsoft on the CCA – is fatally flawed, because the $80 million payment that Microsoft did not make was, by the very terms of the CCA, not due until December 31, 2002. Therefore, nothing was "owing" from Microsoft when the stock declines that plaintiffs complain about occurred, and thus those declines, and AGC's bankruptcy, cannot have been due to any wrongful conduct of Microsoft or its agents. (Microsoft Mem. 9-10.) This argument is, at least on its surface, appealing.

Plaintiffs, however, point to language in certain public documents – the September 1999 press release, the CCA, and the AGC IPO Prospectus – that they argue reflect that "Microsoft assured AG[C]'s public investors of its commitment to purchase $100 million in capacity *during the course of a three year period following December 1999*," by which plaintiffs appear to mean that Microsoft gave the public to understand that it would periodically make capacity purchases throughout the period in question, not that it would make one $80 million purchase at the end of December 2002. (Microsoft Reply 3-4.) It is alleged that Microsoft's failure to provide the promised revenue stream during AGC's first few years ultimately caused AGC's stock to crater and its ultimate filing for bankruptcy relief.

The Court finds it dubious, based on the evidence cited by plaintiff, that the investing public understood that Microsoft had committed to provide a steady stream of cash to AGC throughout the period at issue; however the Court's responsibility at this stage is not to evaluate the sufficiency of plaintiffs' evidence, but only to determine whether "'relief could be granted under some set of facts consistent with the allegations,'" that is, to determine whether it is "at least plausible that plaintiff[s] could *develop* some set of facts that would pass muster." CIBC Ruling, 2005 WL 2990646, at *8, quoting Swierkewicz v. Sorema N.A., 534 U.S. 506, 512-14 (2002).[11]

Microsoft's and Softbank's remaining arguments relate to legal proceedings subsequent to AGC's bankruptcy. Microsoft argues that in those proceedings, "AGC never suggested" that "Microsoft's failure to perform under the CCA proximately caused AGC's bankruptcy," but rather AGC attributed its collapse to GC's inabililty to provide $400 million in necessary capital to AGC, a downturn in the telecommunications sector, and a diminished demand for bandwidth. (Microsoft Mem. 10.) Evidence that AGC, in bankruptcy, attributed its demise to factors other than Microsoft's and Softbank's alleged failure to satisfy their obligations under the CCA will undoubtedly be relevant to the ultimate determination of whether plaintiffs have proved the element of loss causation. However, such evidence is irrelevant to the issue before the Court now, which is solely whether the plaintiffs have pled a cognizable theory of loss causation in the TAC.

---

[11] If Microsoft's loss causation argument ultimately prevails, it is unlikely that plaintiffs will be able to establish loss causation as to Softbank either. Softbank paid all but $5.5 million of its first two tranche payments (Softbank Mem. at 9; TAC ¶ 1225), and it is unclear that plaintiffs can establish that $5.5 million of missing revenue during the Class Period was a substantial factor in causing the billion-dollar stock losses at issue in the TAC.

As for Softbank, its sole argument is that, some time after the close of the period at issue, an arbitration panel actually enforced the terms of the CCA against Softbank and ordered payment to AGC of certain amounts due under it, and that this renders loss causation impossible to prove. (Softbank Mem. at 17-18.) However, plaintiffs' argument is not that Softbank owes AGC money *due under the CCA*, in which case the judgment of the arbitration panel would be relevant, but rather that the failure to disclose Softbank's intent to not to adhere to its obligations under the CCA, and its resulting failure to timely make payments pursuant to that agreement, caused stock declines during the period at issue, an issue which Softbank does not claim was a subject of the arbitration. (Pl. Mem. 9-11.)

For the foregoing reasons, defendants' loss causation arguments do not pose an obstacle to the proposed amendment of the Complaint.

C.  Existence of the Secret Agreements

Microsoft and Softbank next contend that there were no secret negotiations or agreements to avoid the companies' capacity purchase obligations under the CCA. (Microsoft Mem. 11-14; Softbank Mem. 14-17.) Both argue that plaintiffs misinterpret the documentary evidence cited in the TAC. For instance, Softbank argues that the evidence only confirms what was already publicly known about Softbank's capacity purchase: that Softbank might not need the capacity it contracted for, in which case AGC was required to use "commercially reasonable" efforts to remarket any previously-sold and unused capacity. Plaintiffs respond that the evidence supports the broad allegations of the TAC that Softbank "already had determined that it did not need, and would not purchase $100 million in capacity" and that AGC "had agreed orally to not hold Softbank accountable to the $100 million commitment." (Softbank Reply 2.)

The Court need to decide which party's view of the evidence is more persuasive. Prior to discovery, plaintiffs' burden is not to produce evidence from which a trier of fact could infer the existence of any secret agreement. At this stage of the proceedings, the Court's obligation is only to determine whether or not it "appears beyond doubt" that plaintiffs "*can prove no* set of facts in support of [their] claim[s]." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957) (emphasis added). At this point, plaintiffs' allegations permit the inference, at the very least, that Softbank and AGC entered into the CCA with the knowledge that Softbank had neither the need for nor the intention to use any of the capacity it contracted for, and that AGC had agreed not only to use commercially reasonable efforts to remarket Softbank's unused capacity, but also to remarket any of Softbank's unused capacity ahead of its own, essentially negating Softbank's $100 million obligation. At this stage, that is enough. (TAC ¶¶ 1192-1248; Softbank Reply 3.) Microsoft makes essentially the same argument, and for the same reason, that argument is rejected.[12]

D.  <u>Attribution, Scienter, and Culpable Participation</u>

Softbank argues in passing that plaintiffs' allegations as to its Section 10(b) claims are further deficient because plaintiffs fail to allege false statements that can be "attributed" to Softbank, a requirement of its "false statement" Rule 10b-5(b) claims and scienter, a prerequisite

---

[12]  The parties' additional arguments are unavailing. Softbank claims that during the subsequent arbitration concerning the CCA, there was no mention of a secret agreement. (Softbank Mem. at 16-17.)  There are a number of reasons why such an agreement would not have been raised at that time, including the desire to avoid a potential lawsuit from jilted investors, which is exactly what has now occurred. The same applies to Microsoft's argument concerning AGC's bankruptcy proceeding (where, in fact, Microsoft did attempt to excuse itself from any obligations under the CCA). (Microsoft Mem. 14.)  These arguments, while they may prove significant at a later stage of this case, do not render plaintiffs' allegations deficient.

for each of plaintiffs' 10(b) claims. (Softbank Mem. at 13-14; 18-19.) Both Microsoft and

Softbank argue that plaintiffs have failed to allege "culpable participation," an element of

plaintiffs' Section 20(a) control-person claims related to scienter.

This Court has previously pointed out, with respect to the allegations of the Second

Amended Complaint, that plaintiffs failed to "substantiate their assertions of attribution with any

concrete factual allegations. Although AGC's public materials touted general synergy between

Microsoft and Softbank, nothing plaintiffs point to suggests that Microsoft or Softbank

guaranteed any particular decision by or information about AGC, such that the public could

reasonably rely on it." Microsoft/Softbank Ruling, 2005 WL 1881514, at *10. The TAC

rectifies these concerns as to statements relating to the CCA, which unlike statements relating to

accounting improprieties concerning IRU transactions, directly implicate Softbank. As plaintiffs

point out, the TAC alleges that the September 8, 1999, press release touting Softbank's capacity

purchase, the CCA, and the Shareholder Agreement, all were directly issued and/or signed by

Softbank, and that the CCA and Shareholder Agreement were described in and/or attached to

AGC's SEC filings, which were also signed by Softbank's board designee Hippeau. (TAC ¶

1212.) At this stage of the proceedings, plaintiffs have sufficiently pled attribution as to

statements directly relating to the Softbank capacity transaction.

The scienter requirement is quite clearly satisfied. See Ernst & Ernst v. Hochfelder, 425

U.S. 185, 193 n.12, 214 (1976) (noting that 10(b) claim requires that plaintiff plead the element

of scienter, defined as "a mental state embracing intent to deceive, manipulate, or defraud"). The

TAC specifically alleges that Softbank attempted to conceal the secret agreement from the public

in order to artificially inflate the price of AGC stock, of which Softbank owned a substantial

chunk.  (TAC ¶¶ 1206-26, 1252-54.)  "Such express allegations of deliberate misconduct easily

satisfy the standard for pleading scienter."  In re Philip Servs. Corp. Sec. Litig., 383 F. Supp. 2d

463, 472 (S.D.N.Y. 2004).

For essentially the same reason, any argument that plaintiffs fail to satisfy the "culpable

participation" pleading requirement, as to either Microsoft or Softbank, fails.  Similar to the

scienter requirement of Section 10(b), section 20(a) requires that plaintiffs "plead *with*

*particularity* facts giving rise to *a strong inference* that the controlling person knew or should

have known that the primary violator, over whom that person had control, was engaging in

fraudulent conduct."  Andersen Ruling, 322 F. Supp. 2d at 349 (quotation marks omitted and

emphases added).  Plaintiffs' particularized allegations concerning Microsoft's and Softbank's

direction of the board designees, with respect to the secret CCA negotiations, and their

allegations of scienter with respect to the CCA (TAC ¶¶ 1252-54, 1278-80), are surely sufficient

for pleading purposes.[13]

E.     Control

Defendants next argue that plaintiffs have not adequately pled control, an element of both

the Section 20(a) and Section 15 control-person claims.  In the Microsoft/Softbank Ruling, the

---

[13]  In a footnote, Softbank argues that plaintiffs' Rule 10b-5(A) and (C) "scheme" claims
are duplicative of the Rule 10b-5(b) "false statement" claims because the schemes complained of
in the former claims consist solely of false statements charged in the latter claims.  See Lentell v.
Merrill Lynch & Co., Inc., 396 F.3d 161, 177-78 (2d Cir. 2005) (declining to analyze claims as
scheme claims where "the sole basis for such claims is alleged misrepresentations or
omissions").  (Softbank Mem. 20 n.9).  This point, through it might have merit, is not adequately
presented for consideration at this stage.  See, e.g., Diesel v. Town of Lewisboro, 232 F.3d 92,
110 (2d Cir. 2000) ("We do not consider an argument mentioned only in a footnote to be
adequately raised or preserved for appellate review."), quoting United States v. Restrepo, 986
F.2d 1462, 1463 (2d Cir. 1993).

Court held that the fact that "Koll . . . and Hippeau were Microsoft's and Softbank's employees, and that Microsoft and Softbank exercised their power to appoint directors to AGC to appoint those employees" was insufficient to "create an inference that Microsoft and/or Softbank controlled Koll . . .and/or Hippeau in their capacities as AGC's directors." 2005 WL 1881514, at *9. The Court also held that Microsoft's and Softbank's minority stake in AGC, authority to veto certain extraordinary corporate actions by AGC, and power to appoint one director each to AGC's board, were insufficient to allege control of AGC itself. Id. at *13.

However, in the CIBC Ruling, the Court retreated from these holdings. After observing that the relaxed notice-pleading standard of Rule 8(a) applies to allegations of control, 2005 WL 2990646, at *7, the Court stated that "recent decisions, most notably the Second Circuit's ruling in Twombly v. Bell Atlantic Corp. . . . emphasize that where Rule 8(a)'s pleading standard governs, dismissal is improper as long as the compliant furnishes adequate notice of the basis of the plaintiff's claim . . . and 'relief could be granted under [some] set of facts consistent with the allegations.'" Id. at *8, quoting Swierkewicz v. Sorema N.A., 534 U.S. 506, 512-14 (2002) (quotation marks omitted). That is, even if the facts alleged do not, by themselves, permit an inference of control, "dismissal is improper as long as it is at least plausible that plaintiff could develop some set of facts that would pass muster." Id. The Court held, on similar allegations made by plaintiffs against the CIBC defendants, see supra note 1, that the allegations of control were sufficient. CIBC Ruling, 2005 WL 2990646, at *8. The rationale of the CIBC Ruling applies here a fortiori, and for the reasons stated in that opinion, plaintiffs have adequately alleged the element of control.

However, even if the standard were more rigorous than it is, the TAC indeed supplies the concrete factual allegations of control that the Court found lacking in the Microsoft/Softbank Ruling. For instance, plaintiffs allege that Hippeau was not only aware of the secret agreement struck between Softbank and AGC, but that he acted on Softbank's behalf in connection with those dealings, dealings which plaintiffs allege were contrary to the interests of AGC's shareholders. (TAC ¶¶ 1188, 1210-11, 1224, 1244-46.) As for Koll, plaintiffs specifically allege that he was aware of the alleged misdealings between Microsoft and AGC, and that he specifically "negotiated against Asia Global Crossing on Microsoft's behalf to obtain relief from Microsoft's $100 million commitment to purchase capacity." (TAC ¶¶ 1190-91, 1264-69.) In the Microsoft/Softbank Ruling, the Court noted that actions taken by Koll and Hippeau, qua directors of AGC, could not be attributed to Microsoft and Softbank, because they did not act on behalf of Microsoft and Softbank, but rather as fiduciaries of AGC. In the TAC, however, plaintiffs specifically allege actions taken by Koll and Hippeau on behalf of Microsoft and Softbank, and against the interests of AGC.

Microsoft and Softbank respond by attempting to turn this distinction to their advantage. They respond that if Koll and Hippeau did work against the interests of AGC, they did so not only on behalf of Microsoft and Softbank, but as formal Microsoft and Softbank employees, and not in their capacities as AGC directors. Because Koll and Hippeau were not formally acting as AGC directors when they engaged in the charged conduct, defendants argue, that conduct cannot serve as the basis for plaintiffs' claims. (Microsoft Mem. 14-16; Softbank Mem. 12-13.) This argument is a non-starter. Whatever hat they were wearing at the time, if during the time Koll and Hippeau were AGC directors, they did not act as fiduciaries of AGC, but instead flipped

24

back to representing the interests of Microsoft and Softbank against AGC's interests when that would help their employers, that would only serve to bolster plaintiffs' claims. In any event, the capacity (formal or actual) in which Koll and Hippeau were acting when performing any acts at the behest of their employers is a quintessential fact question.

The allegations of the TAC are sufficient to allow plaintiffs to proceed with respect to the control-person claims.

### F. Statute of Limitations

Finally, Microsoft and Softbank argue, in passing, that plaintiffs' claims are time-barred. (Microsoft Mem. 23; Softbank Mem. 19-20.) Softbank's first argument is that any Section 10(b) or 20(a) claim relating to the CCA is untimely because "more than five years have passed since the September 1999 press release was issued and since Softbank signed the Shareholders Agreement and CCA." See GC Underwriters Ruling, 313 F. Supp. 2d at 196 (observing that statute of limitations for fraud-based claims is, inter alia, five years after violation). Plaintiffs respond that the violations at issue do not arise from the September 1999 press release, CCA, or Shareholder Agreement alone, but rather from the scheme to conceal Softbank's secret agreement when AGC was a public company, including the approval and issuance of numerous allegedly false and misleading SEC filings in 2000-2001. (Softbank Reply 12-13.)

Whether or not this suffices, this particular timeliness issue appears to be controlled by the relation-back provision of Fed. R. Civ. P. 15(c)(2). It is undisputed that Softbank was brought into this litigation upon the filing of the Amended Consolidated Class Action Complaint on August 11, 2003, well within the five-year statute of limitations on either party's view of the facts. Rule 15(c)(2) states that "[a]n amendment of a pleading relates back to the date of the

original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." See also Stevelman v. Alias Research Inc., 174 F.3d 79, 86-87 (2d Cir. 1999) ("Under Fed. R. Civ. P. 15(c), the central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." (quotation omitted)).  While fraud related to Microsoft's and Softbank's purchase commitments under the CCA is a different matter from accounting improprieties relating to IRUs, the focus of all prior versions of the complaint, at base what is at issue is Microsoft's and Softbank's involvement, direct or indirect, in the misrepresentation of AGC's financial picture during the years leading up to its bankruptcy and ultimate collapse.  While it might turn out, upon development of the factual record, that these two fraudulent schemes are so distinct as to render the relation back doctrine inapplicable, the Court is not convinced at this early stage that such is the case.

Defendants also contend that plaintiffs' Section 15 claims are time-barred.  (Microsoft Mem. 23; Softbank Mem. at 19-20.)  The applicable statute of limitations for these claims is, inter alia, "one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable dilligence."  15 U.S.C. § 77m; see also GC Underwriters Ruling, 313 F. Supp. 2d at 196.  The argument is that plaintiffs had notice of the facts underlying their claims against Microsoft and Softbank more than a year prior to August 11, 2003, the date on which the Amended Consolidated Class Action Complaint,

which added Microsoft and Softbank as defendants, was filed.[14]  The Second Circuit has

summarized the one-year time limitations period as follows:

> The one-year limitations period begins to run after the plaintiff
> "obtains actual knowledge of the facts giving rise to the action or
> notice of the facts, which in the exercise of reasonable diligence,
> would have led to actual knowledge." <u>Kahn v. Kohlberg, Kravis,
> Roberts & Co.</u>, 970 F.2d 1030, 1042 (2d Cir. 1992).  Furthermore,
> "when the circumstances would suggest to an investor of ordinary
> intelligence the probability that she has been defrauded, a duty of
> inquiry arises." <u>Dodds v. Gigna Secs., Inc.</u>, 12 F.3d 346, 350 (2d
> Cir. 1993).  The circumstances that give rise to a duty of inquiry
> are often referred to as "storm warnings." <u>Id</u>.  Once a plaintiff
> receives these "storm warnings" and a duty of inquiry arises,
> "knowledge will be imputed to the investor who does not make
> such an inquiry." <u>Id</u>.  Moreover, whether the securities fraud claim
> of a person who receives "storm warnings" is time barred "turns on
> *when*, after obtaining inquiry notice," the plaintiff "in the exercise
> of reasonable diligence, should have discovered the facts
> underlying the [defendant's] alleged fraud." <u>Rothman v. Gregor</u>,
> 220 F.3d 81, 97 (2d Cir. 2000).

<u>Levitt v. Bear, Stearns & Co.</u>, 340 F.3d 94, 101 (2d Cir. 2003).

Neither Microsoft nor Softbank argues that plaintiffs had actual notice of the facts

underlying the CCA-related claims more than one year before the Amended Consolidated Class

Action Complaint was filed.[15]  As to the question of inquiry notice, in the <u>GC Underwriters</u>

---

[14]  This Court previously indicated that under certain circumstances, claims against new defendants in an amended pleading may be deemed asserted as of the date of the original pleading, pursuant to Fed. R. Civ. P. 15(c)(2).  <u>CIBC Ruling</u>, 2005 WL 2990646, at *3.  However, the Second Circuit has held that "when a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes." <u>Rothman v. Gregor</u>, 220 F.3d 81, 96 (2d Cir. 2000).

[15]  In briefing the statute of limitations issue on the prior motion to dismiss the Second Amended Complaint, Microsoft and Softbank did claim that plaintiffs had actual notice of the facts underlying the *IRU-related* claims in the Second Amended Complaint more than a year prior to the filing of the Amended Consolidated Class Action Complaint.  (Microsoft Mem. Mot.

<u>Ruling</u>, this Court observed, as to claims relating to GC, that "[p]laintiffs' claim that reasonable investors were not at least on inquiry notice of GC's fraudulent accounting practices before the bankruptcy filing [in January 2002] is preposterous." 313 F. Supp. 2d at 200 (emphasis added). Based on press releases, public statements by company executives, and examination of publicly-available financial data, the Court noted that "[w]hen a company that has touted its rosy financial picture sees its stock prices plummet by over 90%, suddenly finds itself in danger of bankruptcy, and refers through its CEO to a principal source of its reported profitability as a 'mystery' and a 'charade,' it is fatuous to claim that the circumstances would not suggest to an investor of ordinary intelligence the probability that she has been defrauded." <u>Id</u>. at 202. Thus, the Court held that plaintiffs were on inquiry notice, at the latest, by December 2001. <u>Id</u>. at 200.

It is all but certain that the same date applies to claims relating to AGC. GC and AGC were involved in the same business, the sale of bandwidth; after the AGC IPO, the company continued to be controlled by GC, which retained a 57% ownership stake in AGC (AGC IPO Prospectus, Liebesman Decl. Ex. 1, at 72); the two companies had overlapping directors and officers, a common Chairman, a common co-Chairman, and similar business plans (Compl. ¶¶ 29, 34-35, 40, 53, 56, 58, 60-62, 64, 66); and beginning in early October 2001, Asia Global Crossing and Global Crossing also shared a common CEO (<u>id</u>. ¶ 684). In addition, like GC, AGC experienced serious stock declines during 2001. (TAC ¶¶ 1300-06.) By October of that year, AGC stock had lost 90% of its value and never recovered (AGC Underwriters' Mot. Dismiss, Simmons Decl. Ex. 10.) <u>See</u> <u>GC Underwriters Ruling</u>, 313 F. Supp. 2d at 201 ("While a decline in stock value is not in itself proof of fraud, the Second Circuit has noted that such

Dismiss 24-25; Softbank Mem. Mot. Dismiss 23-25.)

declines "should have put [a reasonable investor] on notice of fraud.").

Moreover, through neither Microsoft nor Softbank raises the point, the TAC itself alleges that throughout 2001 and 2002, "Microsoft and Softbank's fraudulent scheme was gradually revealed to the market" through AGC's release of financial information, "which disclosed that the promised revenues from Microsoft and Softbank were not being received," and that the stock declines at issue in this case "are directly attributable to the market's absorption of information regarding the failure of expected revenues from Microsoft and Softbank to materialize." (TAC ¶ 1299.) If, throughout 2001, the market was "absorbing" information to the effect that expected revenues from Microsoft and Softbank under the CCA were not being received, plaintiffs are hard-pressed to argue that they were not on inquiry notice of fraud (at the very least) by December 2001.

In any event, press releases and financial documents filed in early 2002, more than a year before Microsoft and Softbank entered this case, expressly alerted AGC shareholders that its largest shareholder and former corporate parent, GC, was under investigation for fraud, and made clear that these allegations had implications for AGC, specifically that AGC had "engaged external counsel for the purpose of investigating issues raised by these allegations so far as they concern" AGC, and that the company could not release financial reports until the pending investigations had concluded. (AGC Feb. 26, 2002, Press Release, AGC Und. Mot. Dismiss, Liebesman Decl. Ex. B; AGC Form 12b-25, dated April 2, 2002, AGC Und. Mot. Dismiss; Simmons Decl. Ex. 10.) Thus, more than a year before Microsoft and Softbank were ultimately sued, plaintiffs were unquestionably on inquiry notice that they had been defrauded. However, that does not end the inquiry.

In the <u>GC Underwriters Ruling</u>, the Court did not ultimately dismiss any claims on statute of limitations grounds, although it held that more than a year had run from the commencement of the inquiry notice period to the filing of the claims at issue in that case. Because the Court determined that plaintiffs had conducted some inquiry into the allegations underlying the complaint shortly after the start of the inquiry notice period, it noted that the limitations period would have started only when an investor, acting with reasonable diligence, would have turned up the facts underlying their claims, 313 F. Supp. 2d at 203-04, and that such a fact-based determination could not be made at the pleadings stage.

Defendants make no mention of this "due-diligence" aspect of the statute of limitations inquiry, let alone address the change in focus of the TAC from allegations of accounting improprieties to allegations about the failure to purchase bandwidth under the CCA, a distinction highly relevant to resolution of the due diligence question. Under the circumstances, the Court declines to hold, with no briefing on the issue, and with an ill-developed factual record, that as a matter of law plaintiffs should have discovered the facts underlying their allegations prior to August 11, 2002, one year before they filed suit against Microsoft and Softbank. <u>See</u> <u>Robertson v. Seidman & Seidman</u>, 609 F.2d 583, 591 (2d Cir. 1979) ("Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case – similar to the type of inferences which must be drawn in determining intent and good faith, [and w]hen conflicting inferences can be drawn from the facts, . . . summary judgment is inappropriate." (citations omitted)). Therefore, while this objection may ultimately prove to have merit, as of now, the Court declines to hold that plaintiffs' Section 15 claims are time-barred.

## CONCLUSION

For the foregoing reasons, the motion to amend the Second Amended Consolidated Class Action Complaint (# 574) is denied as to plaintiffs' respondeat superior claims, but granted in all other respects.

SO ORDERED.

Dated: New York, New York
      June 13, 2006

GERARD E. LYNCH
United States District Judge